**Leonard M. NAPHTALI, Plaintiff,**

v.

**William K. REILLY, Administrator, United States Environmental Protection Agency, Defendant.**

**No. 89 Civ. 1523 (BN).**

United States District Court,
S.D. New York.

Nov. 29, 1991.

Cleary, Gottlieb, Steen & Hamilton (Hyman Hacker and Richard Conza, of counsel), New York City, for plaintiff.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Diana Hassel and Edward Ferguson, Asst. U.S. Attys., of counsel), New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International trade, sitting as a United States District Court Judge by designation:

### INTRODUCTION

Dr. Leonard Naphtali ("Naphtali"), 58 years of age at the time of his application for a position with the United States Environmental Protection Agency ("EPA"), brings this employment discrimination action against the EPA alleging "disparate treatment" on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621–634 (1967). Jurisdiction over this particular federal question is predicated upon 29 U.S.C. § 633a.

Naphtali demands a wide spectrum of relief, including reinstatement, back pay, pension credits and attorneys' fees, to redress the EPA's perceived failure to appoint Naphtali to a permanent position within the EPA, failure to appoint him to any supervisory positions and failure to renew Naphtali's temporary appointment.

Further, Naphtali contends that his prior status as a permanent employee within the United States Department of Energy (the "Energy Department") survived Naphtali's subsequent decision to accept a temporary position with the EPA. As a result, the EPA's adverse personnel action denying renewal of Naphtali's temporary appointment purportedly violates Naphtali's procedural rights as a statutory "employee" within the meaning of the Civil Service Reform Act (5 U.S.C. § 7511(a)(1)(A) (1978) for purposes of adverse personnel actions) entitled to, prior to termination, the procedural protection afforded to permanent employees of the federal government. *See* 5 U.S.C. § 7513.

Opposing these allegations the EPA responds that any adverse personnel action taken against Naphtali resulted solely from his inadequate performance and the superior qualifications of other candidates. In addition, notwithstanding Naphtali's former position in the Energy Department, the plain fact that Naphtali's appointment within the EPA was temporary prevented him from qualifying as a statutory "employee" entitled to procedural protection prior to non-renewal of his temporary appointment by the EPA. *See* 5 U.S.C. §§ 7511(a)(1)(A), 7513. Accordingly, the EPA requests dismissal of the complaint.

Following a five day bench trial on the foregoing issues, the court determined that Naphtali was only hired pursuant to a temporary appointment, and was in fact discharged as a result of his inadequate performance rather than illegal age discrimination (Tr. 706). Consequently, Naphtali's claims were dismissed with prejudice, although without costs (Tr. 709).

For purposes of assisting the court in supplementing its oral decision, however, the litigants were advised to submit post-trial memoranda (Tr. 710). Upon extensive consideration of counsels' thorough post-trial memoranda, the testimony at trial, the stipulated facts and all of the documentary exhibits the court adheres to its trial ruling dismissing the complaint, and makes the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) Fed. R.Civ.P.

### FINDINGS OF FACT

Naphtali, born August 6, 1927, possesses a broad background in the field of chemical engineering. He has earned an undergraduate degree in chemical engineering from Cooper Union and masters and doctorate degrees from the University of Michigan. Thereafter, Naphtali obtained numerous years of experience both as a professor of chemical engineering as well as a developer of computer software in the private sector.

Commencing in May, 1977 and through August, 1985 Naphtali became an employee of the Energy Department, then known as ERDA, located in the Washington D.C.

area. He served as a chemical engineer, obtaining a general service classification of GS–14 step 10 (Tr. 25–31). Despite achieving permanent status in the Energy Department and attaining the highest step at the GS–14 salary grade during that eight year period, since Naphtali's family remained in New York, he constantly explored possible employment opportunities which could relocate him to New York.

In April and May, 1985, Naphtali contacted by telephone and also met with Conrad Simon ("Simon"), Chief of the Air and Waste Management Division ("AWMD") of Region II of the EPA in New York[1]. Having met Simon briefly and but once approximately 14 years earlier, in 1971, when Naphtali worked for the City of New York, Naphtali inquired of Simon regarding any available positions within the EPA (Tr. 33–36, 508). Simon informed Naphtali that he would necessarily be required to proceed through the merit procedure in order to obtain a position in the EPA at the GS–13 or GS–14 level. Consequently, Simon explained, the only positions Naphtali was eligible to apply for in the AWMD were at grade GS–12 or below, but assuming he was interested in such a position Naphtali could submit an appropriate application (Tr. 508–09). Shortly thereafter, Naphtali submitted a Form SF–171 application for employment with the federal government, indicating on the Form in response to Item 15 that he was seeking to fill a permanent slot.

Simon indicated that Stanley Siegel ("Siegel"), chief of the Compliance and Enforcement Section of the Solid Waste Branch of the AWMD, had positions and would contact Naphtali to arrange a future interview (Tr. 37). Siegel's group was primarily responsible for ensuring compliance with the regulatory program mandated by the Resource Conservation and Recovery Act ("RCRA") to oversee facilities generating or disposing of hazardous wastes (Tr. 318–19).

In June or July, 1985, Naphtali was interviewed by Siegel. Although Siegel observed Naphtali to be "articulate, friendly and rather intelligent" during the interview, Siegel's overall impression of their meeting was negative in that Siegel perceived Naphtali to be without genuine interest or motivation with respect to employment in this section. Indeed, Siegel expressed his "reservations" to Simon concerning Naphtali's ability to be an appropriate staff person in Siegel's group (Tr. 322). Despite Siegel's reluctance, Simon believed that Naphtali's strong backgound entitled him to an opportunity to prove his ability to perform. On that basis, Simon suggested that Siegel consider hiring Naphtali under a temporary one-year appointment (Tr. 323–24, 509–10).

Naphtali was expressly apprised of the EPA's offer of a one-year temporary appointment as a chemical engineer with region II of the EPA, by letter dated August 5, 1985, which read in relevant part:

> This is to confirm our offer of a Chemical Engineer position GS–819–12 step 10, with a salary of $41,105 per annum. *This position is temporary, not to exceed one year* ... (emphasis supplied).

Simon recalled discussing the temporary nature of the appointment with Naphtali (Tr. 511). Also, in addition to receiving the letter described above, Naphtali was sent a Form SF 50–B Notification of Personnel Action which clearly states that the appointment was not to exceed August 29, 1986 and that "[e]mployment terminates when the limitation ... is reached. There is no authority to pay for service therefrom without appropriate personnel action." Moreover, even Naphtali himself admitted that when he received this offer from the EPA, he *knew* it was an offer for a temporary appointment (Tr. 100).

After accepting these conditions in early September 1985, Naphtali began his temporary appointment within the Compliance and Enforcement Section, under Siegel's supervision (Tr. 43–46, 49, 324).

---

**1.** In Region II of the EPA in 1985, the AWMD was responsible for enforcement of federal rules with respect to air and solid waste matters in the New York, New Jersey and Caribbean areas. The director of the AWMD from 1985 to the present has been Conrad Simon.

## FISCAL YEAR 1986

Initially, Naphtali was assigned duties encompassing geographical areas within New York State. His primary responsibility was to coordinate with state agencies concerning facilities in those areas, and to conduct inspections of facilities therein. Each engineer or scientist in the Compliance and Enforcement Section was responsible for conducting a certain number of inspections in the geographical areas to which they were assigned. Siegel convincingly detailed his routine of conveying the importance of conducting inspections to his staff during weekly meetings and discussions with Siegel (Tr. 326–27).

The requirement mandating inspections was also set forth in the Performance Agreement which was given to Naphtali, on March 27, 1986. Naphtali and Siegel executed the document for the purpose of acknowledging that they discussed the critical job elements and performance standards covered in the Performance Agreement. It indicated that Naphtali was required to complete at least eighteen (18) inspections in fiscal year 1986.

Naphtali was also assigned to work on a new initiative for waste oil enforcement due to his experience with energy resources, and given responsibility for tracking the training needs of staff members within the Compliance and Enforcement Section (Tr. 324–25).

Within the first few months of Naphtali's employment, Siegel voiced dissatisfaction at the pace which Naphtali completed inspections. Siegel expressed the need for serious improvement if Naphtali intended to fulfill the required quota of eighteen inspections for fiscal year 1986 (Tr. 327). Consequently, Siegel's mid-year evaluation of Naphtali, on April 30, 1985, reflected an unsatisfactory rating for the part of his job responsibilities relating to completing inspections (Tr. 330–31); Naphtali's overall score of 255 corresponded to an adjective rating of "minimally satisfactory," inclusive of Naphtali's duties involving the waste oil initiative and tracking of staff training.

In response to Siegel's alarming concerns, Naphtali devoted more attention to inspections, and completed his quota for fiscal 1986. Siegel noted Naphtali's improvement in Siegel's end-of-year performance evaluation of Naphtali, whereby he attained a score of 315, and was rated "fully successful." Even this rating, however, represented the lowest numerical evaluation issued by Siegel to any of the scientists or engineers he supervised in that division (Tr. 336).

Naphtali inquired about openings for permanent positions in other divisions in Region II for which he believed himself to be qualified. He subsequently applied for a number of supervisory positions at the GM–13 and GM–14 levels, which were being announced under a merit promotion system.

One of these positions was for section chief of the Site Compliance and Investigations Branch of EPA, part of the Super-Fund program organized pursuant to the Environmental Response Compensation and Liability Act providing for cleanup of toxic waste sites (Tr. 272). John Czapor ("Czapor"), a former EPA official, testified concerning the selection of section chiefs. Czapor interviewed all the candidates, including Naphtali, and selected three individuals for the positions (Tr. 276–77, 279). Chief among the criteria for selection was a thorough knowledge of the SuperFund program, and each of the three candidates selected had extensive experience in the SuperFund program (Tr. 276–79). Comparing Naphtali's experience with that of the individuals selected for the positions, Czapor stated:

> Mr. Naphtali had government experience, he had extensive government experience. He certainly presented himself well, was very articulate. He was relatively *new* to the Environmental Protection Agency and very new, *and also did not have a particularly thorough understanding of the SuperFund program. And that was obviously a very driving factor in my decision* (emphasis supplied).

Naphtali also submitted an application for a position as chief of the Compliance and Enforcement Section which was being selected by Simon. This appointment entailed responsibility for supervising two sections that did field work in furtherance of the goals of RCRA (Tr. 527).

Simon's testimony, however, successfully eliminated any negative inferences reflecting age bias arising from his selection of another candidate for the opportunity (Tr. 526). Simon articulated that the candidate he appointed had substantial prior experience as chief of a similar branch. Although Naphtali applied, Simon did not select Naphtali for this managerial role in light of his questionable performance record coupled with Naphtali's relative lack of previous supervisory experience in the regulatory enforcement area (Tr. 528).

Despite not selecting Naphtali for a supervisory position, while reviewing Naphtali's performance record for fiscal year 1986 Simon acknowledged that although Naphtali had clearly engaged in sub-par performance for the first six months, he had shown potential for improvement within the final month of the second half of fiscal 1986 by completing more inspections. As a result, on September 29, 1986, Simon recommended renewal of Naphtali's temporary appointment for fiscal year 1987 (Tr. 514–16).

FISCAL YEAR 1987

Contemporaneously, Naphtali was transferred to the Hazardous Waste Programs Branch (the "Programs Branch") of the AWMD which branch was created in response to growth in size of the entire division. Simon transferred Naphtali to provide him with the opportunity to engage in more analytical work, policy analysis, scientific engineering, and research and information gathering through trade journals, rather than field inspections for which Naphtali had demonstrated little enthusiasm (Tr. 516).

On October 3, Naphtali executed a revised Performance Agreement which was also signed by Joel Golumbek ("Golumbek"), the departing Chief of the Programs Branch. Golumbek was succeeded as Chief by Bruce Engelbert ("Engelbert"). Engelbert, along with Edward Louie ("Louie"), deputy branch chief, acted as Naphtali's supervisors from October, 1986 through February, 1987.

Naphtali's initial responsibilities in the Programs Branch included oversight of the New State RCRA agenda, and specific programs throughout the region such as waste minimization and the waste oil program (Tr. 416). Naphtali's duties changed, however, when Richard Salkie ("Salkie") succeeded Engelbert as chief of the Programs Branch in February, 1987.

Approximately in March, 1987 Salkie modified Naphtali's duties by relieving him of New York oversight duties. According to Salkie, it was necessary to modify Naphtali duties due to Naphtali's consistently inadequate performance regarding oversight of the New York RCRA programs (Tr. 418). In fact, of the ten engineers and scientists in Salkie's branch, he found Naphtali to be the single poorest performer (Tr. 424, 431). Salkie then focused Naphtali on hazardous waste classification projects hoping Naphtali, given his educational background, would express greater interest in performing analysis (Tr. 428).

Salkie effectively summarized his perceptions regarding Naphtali's performance in the program by the following statement: "I didn't find any enthusiasm. I didn't find any commitment or desire to do the work of the program" (Tr. 423). Justifying his general observation, Salkie commented that while Naphtali correctly accomplished the task of waste classification, disappointingly the completion of his duties required "an excessive amount of time."

Indeed, Salkie markedly emphasized that a substantial proportion of Naphtali's job-related inadequacies were attributable to the excessive amount of time he devoted to reading newspapers, trade journals and magazines on the subject of hazardous waste (Tr. 417). While Salkie acknowledged that, to some extent, reviewing materials on hazardous waste could be beneficial to someone in Naphtali's position, when it reached the point where, as Salkie observed regarding Naphtali, the employee

becomes unproductive in his regular duties, then the practice of reading newspapers presents a hindrance as opposed to a benefit (Tr. 453–54).

Additionally, Salkie noted with disapproval Naphtali's failure to perform the other aspect subsumed within the duty of waste classification—interaction with state agencies participating in the projects, i.e., obtaining information on state classification methods, providing feedback, making recommendations and influencing state decisions in line with overall federal directives (Tr. 429–30).

Regarding the waste minimization project, despite Naphtali's thorough grasp of materials and information disseminated to Federal personnel in the Programs Branch, Salkie sharply criticized Naphtali's reluctance to accomplish his further duty of facilitating transfer of this critical subject matter to the states (Tr. 431).

On March 30, 1987, Salkie prepared a mid-year evaluation of Naphtali's performance. Salkie rated Naphtali's mid-year performance as 282, or minimally satisfactory. In order to arrive at this determination, Salkie incorporated Engelbert's rating of 280 covering the four month period between October, 1986 and January, 1987 during which Engelbert supervised Naphtali.

On May 12, Salkie and Naphtali engaged in a meeting to discuss the mid-year evaluation (Tr. 424–26). Although Naphtali denies that this meeting transpired, the court finds that Naphtali evidenced his participation in a conversation with Salkie regarding the 1987 mid-year evaluation through execution of Naphtali's signature, dated May 12, on his Performance Guide acknowledging his evaluation (pltf's exh. 8, Section D). Salkie persuasively described reviewing each critical job standard with Naphtali impressing upon him the need for vast improvement, but, unfortunately, Naphtali failed to correct his employment performance following the mid-year evaluation. Salkie observed that Naphtali continued to read newspapers or technical journals at his desk (Tr. 431). More, Naphtali remained slow in completing his assignments, and continued his pattern of not informing himself of state activities in the areas of hazardous waste classification and not transferring information regarding waste minimization to state agencies.

Simon was kept informed of Naphtali's performance in the Programs Branch (Tr. 517–19). Based on the information he received, and his own experiences with Naphtali, Simon decided against renewal of Naphtali's temporary appointment for a third year (Tr. 515–16, 518–21). Simon met with Naphtali in early August and indicated that he was terminating Naphtali's employment due to Naphtali's poor performance.

Naphtali brought this information to the attention of Randye Stein ("Stein"), a volunteer with the Equal Employment Opportunity Office of the EPA, suggesting that he was considering filing a formal complaint alleging discrimination. Stein discussed the matter with Simon. Although Simon would not alter his decision to terminate Naphtali, Simon purposefully agreed to permit Naphtali to continue his temporary appointment for another three months, through November, in order to allow Naphtali more time to obtain another position (Tr. 522).

In September 1987, Andrew Bellina ("Bellina") replaced Salkie as chief of the Programs Branch. After assuming this role, Bellina spoke to Naphtali about his Performance Agreement and discussed Naphtali's assignments. At that point Naphtali's duties had been primarily limited to responding to Freedom of Information Act ("FOIA") requests.

Bellina also expressed dissatisfaction with Naphtali's performance (Tr. 242, 245–46). Specifically, Bellina recalled that from the outset Naphtali was difficult to motivate respecting completion of assignments, and failed to meet deadlines set for responding to FOIA requests (Tr. 242–43). With time, however, Bellina noted that Naphtali's performance showed some signs of progress (Tr. 630).

The responsibility of preparing Naphtali's full-year evaluation rested with Bellina as Naphtali's end-of-year supervisor. For

the two-month period when Bellina was Naphtali's supervisor Naphtali received a 295, still minimally satisfactory. In determining Naphtali's full-year rating for fiscal 1987, however, Bellina incorporated Salkie's mid-year evaluation, arriving at a total figure of 285, again minimally satisfactory.

On October 27, Bellina arranged to meet with Naphtali to review his performance for fiscal 1987. Since Salkie supervised Naphtali for a significant portion of the year, he attended the meeting as well. At the meeting both Bellina and Salkie reviewed with Naphtali their respective evaluations in conjunction with the performance standards.

Naphtali contends that this meeting was simply orchestrated as an *ex post facto* attempt by the EPA to justify Simon's decision to not renew Naphtali's temporary appointment for a third year (Tr. 84–86). Nevertheless, Bellina and Salkie insisted that they were not aware of Naphtali's employment status at the meeting (Tr. 246, 436–37). Rather, as Simon explained, EPA procedure simply required that each employee on staff receive an evaluation at the end of the year (Tr. 522–23).

Irrespective of this somewhat unique scenario whereby a former supervisor assisted a current supervisor during an end-of-year evaluation meeting, the purpose for the format was not, as suggested by Naphtali, intended to be adversarial. Rather, the court finds that the format was chosen in Naphtali's best interests. Since Salkie had evaluated Naphtali for a large part of the year, he was plainly in the most suitable position to review that performance period with Naphtali, as a supplement to Bellina's review.

As of November 29, 1987, Naphtali's temporary appointment for employment as a chemical engineer with the EPA was formally terminated.

Subsequently, in early 1988, Naphtali again unsuccessfully competed for placement in certain EPA supervisory positions. One position was for section chief within the Southern New Jersey SuperFund program. John Frisco ("Frisco"), the Deputy Director for the EPA's SuperFund pro-

gram in New Jersey, clarified that his eventual selectee represented the "clear-cut choice ... [for the reason that] [h]e had both a fair amount of technical experience working in the SuperFund, as well as a direct connection or a direct experience with the State of New Jersey" (Tr. 652).

Additionally, Siegel credibly testified about his decision not to select Naphtali in March 1988 for either of two supervisory positions as section chief in the Hazardous Waste Facilities Branch, which bears primary responsibility for the permitting of hazardous waste facilities (Tr. 337–38). The position entailed directing a group consisting of engineers, scientists and clerical staff to adhere to commitments in terms of issuing technically and administratively complete permits for the appropriate communities (Tr. 338).

Siegel selected two individuals for these positions who had a strong background and experience in the permitting aspects of RCRA work. Siegel explained that he did not select Naphtali due to the fact that "[he] did not have knowledge of the permitting program. That was one element. Two, based on my previous supervision of Mr. Naphtali, I felt he did not have good time management or project management abilities, which are two fundamental attributes that I would look for in a manager" (Tr. 340). It is evident, then, that Naphtali's failure to acquire either supervisory position arose solely from his mediocre past performance and the superior qualifications of other candidates.

## CONCLUSIONS OF LAW

"All personnel actions affecting employees or applicants for employment [with an agency of the United States] who are at least 40 years of age ... shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Section 633a applies to the federal government the same general restrictions against discriminatory employer practices predicated on age, found in section 4 of the ADEA. *See* 29 U.S.C. § 623(a).

ADEA actions apply the same evidentiary burdens as cases brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e17. *See, e.g., Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991); *Russo v. Trifari, Krussman & Fishel, Inc.,* 837 F.2d 40, 43 (2d Cir.1988).

The ADEA specifically requires that the plaintiff demonstrate that the adverse employment decision in question was made "because of age." 29 U.S.C. § 623. The Second Circuit has interpreted this requirement to signify that age represents a "determinative factor" in the alleged discriminatory treatment. *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989); *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 104 (2d Cir. 1989); *Paolillo v. Dresser Indus., Inc.,* 865 F.2d 37, 40, *modified,* 884 F.2d 707 (2d Cir.1989) (plaintiff must show that age was a "factor that made a difference" in defendant's decision to implement an elective termination program).

Plaintiff's burden of proving that age was a determinative factor may be established either directly or indirectly. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244, 109 S.Ct. 1775, 1787, 104 L.Ed.2d 268 (1989); *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

Absent direct evidence proof that age was a determinative factor is developed in accordance with the familiar *McDonnell Douglas/Burdine* burden-shifting formula. *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d at 1568 (shifting evidentiary burdens have been designed to allow the plaintiff to prove his case despite the absence of direct evidence). The parties' respective burdens of producing evidence are divided into three steps.

■ Plaintiff bears the initial burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. In a case brought under ADEA, the plaintiff must prove (1) that he was over 40 years of age, (2) that he applied for and was qualified for the position sought and, (3) that he was "denied employment under circumstances that give rise to an inference of discrimination." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114–15 (2d Cir.1988).

Significantly, "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Indeed, the nature of the plaintiff's burden at this preliminary stage is *de minimus. Dister,* 859 F.2d at 1114 (*citing Sweeney v. Research Found. of the State Univ. of N.Y.,* 711 F.2d 1179, 1184 (2d Cir.1983)).

■ Once plaintiff establishes his *prima facie* case, an inference or rebuttable presumption of discrimination is raised that the adverse employment decision, unless otherwise explained, was more likely than not based on impermissible discriminatory factors. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Dister v. Continental Group,* 859 F.2d at 1111.

■ To rebut plaintiff's *prima facie* assertions, the defendant must articulate some legitimate non-discriminatory reason for the employee's rejection. This burden is simply one of articulation of production; it is not a burden of proving the absence of a discriminatory motive. *Burdine,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95 ([the employer need] only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. *Id.* at 257, 101 S.Ct. at 1095).

■ The plaintiff, however, never relinquishes the ultimate burden of persuading the trier of fact that he was subjected to age discrimination. Hence, in the "pretext" stage a merger occurs between plaintiff's ultimate burden and the burden of proving that the defendant's proffered reasons are merely a pretext for discrimina-

tion rather than the true reasons for its actions. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff makes this showing "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. *See also McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1824–25; *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d at 1568; *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).

### Naphtali's Claims of Discrimination

Naphtali's allegations of discrimination concern the fact that (1) he was not offered a permanent position in 1985, (2) that his temporary appointment was not renewed for a third year in 1987, and (3) that he was not promoted to certain supervisory positions for which he applied. But plainly, in all three situations Naphtali failed to prove by a preponderance of the evidence that the enunciated reasons for the EPA's adverse personnel decisions concerning Naphtali were merely pretexts for illegal age discrimination.

### Prima Facie Case

■ Applying the Title VII approach to the facts of the instant matter, the court holds that, initially, Naphtali set forth a *prima facie* case of age discrimination.

First. Naphtali was 58 years of age when he applied for a position at the AWMD, clearly a member of the over 40 age group protected by the statute.

Second. Undeniably, Naphtali possesses an adequate background as illustrated by his educational qualifications, which include an undergraduate degree in chemical engineering from Cooper Union, and masters and doctorate degrees in chemical engineering from the University of Michigan. His educational prowess is buttressed by his extensive practical experience as an educator at the university level, and as a chemical engineer in the private sector followed by eight years successfully working within the Energy Department. Without belaboring the point, there is ample support for the proposition that Naphtali appeared highly qualified and particularly experienced in the field of chemical engineering.

Third. The circumstances surrounding Naphtali's initial temporary appointment in 1985, non-selection for supervisory positions and termination in 1987 give rise to an inference of discrimination predicated upon age. Essentially, an employer's preferential selection of less-qualified employees outside of the protected age class, under similar employment circumstances, is sufficient to create the necessary inference of age discrimination under ADEA. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Taggart*, 924 F.2d at 46; *Montana*, 869 F.2d at 105. "The inference ... may be shown by direct ... statistical ... or circumstantial evidence such as documentation of preference for younger employees" *Taggart*, 924 F.2d at 46 (*citing Montana*, 869 F.2d at 104).

Here it is true, for example, that during the period following Naphtali's initial interview with Simon and periodically during Naphtali's tenure, the AWMD hired, for permanent positions, individuals under age 40, some with little or no environmental experience (Tr. 383–84). More, Siegel acknowledged that the work force within region II of the EPA was uniformly younger than any other region in the EPA. Siegel attributed this statistic to the fact that the vast majority of applicants were either immediately out of college or recent graduates (Tr. 405–07). John Henderson ("Henderson"), chief of the EPA's Human Resources Branch, added that one of the EPA's strategies, aimed primarily at increasing the level of women and minorities in the EPA, was to target recruiting efforts primarily towards college interviews and referrals (Tr. 219–20).

Collectively, the circumstances under which personnel decisions were made within the AWMD compounded by the skewed statistical makeup of the division provide sufficient foundation to establish the minimal requisite inference of age discrimination necessary to complete Naphtali's *prima facie* showing.

### Pretext Stage

■ In any event, the Court properly dismissed Naphtali's claims for the reason that Naphtali failed to prove that the EPA's stated legitimate reasons for the various adverse personnel decisions made against Naphtali were pretexts for discrimination, and that age was a "determinative factor" considered under the aforementioned circumstances. *Montana,* 869 F.2d at 104; *Hagelthorn v. Kennecott Indus. Corp.,* 710 F.2d 76, 86 (2d Cir.1983).

The evidence in the record firmly establishes that Naphtali's age played no role in the decision to hire Naphtali under a temporary appointment in 1985, and in the decision not to extend the term of his appointment in 1987. Similarly, the decision not to give Naphtali a supervisory position was based on his inadequate work record and the superior ability and qualifications of others who applied.

According to highly damaging testimony, *convincingly documented by each and every one of Naphtali's superiors,* throughout his tenure at the EPA, Naphtali simply did not focus enough attention towards his specific responsibilities or the goals of the EPA. Moreover, each and every supervisor's dissatisfaction with Naphtali's performance is bolstered by physical evidence appearing in the form of the predominantly negative performance evaluations described *supra.*

The short of the matter: The conclusion is inescapable that Naphtali's tenure at the EPA was only attributable to his substandard work performance coupled with the superior particular capabilities of competing employees, and, while fatal to Naphtali's claims, age simply did not make a difference.

### Procedural Claim

■ Finally, Naphtali vigorously insists that for purposes of termination of employment he should have been classified as a statutory "employee" within the meaning of the Civil Service Reform Act (5 U.S.C. § 7511(a)(1)(A)) with consequent entitlement to the procedural protection afforded to such individuals prior to removal under 5 U.S.C. § 7513. Naphtali maintains that the reason he fits within the definition of "employee" is due to the fact that he completed one year of continuous employment for the Government during his tenure with the Energy Department between 1977 and 1985.

The court disagrees. The Civil Service Reform Act, under Title 5 of the United States Code, codifies the general and permanent laws relating to the organization of the Government of the United States and to its civilian officers and employees. Subpart F which is entitled "Labor Management and Employee Relations," contains within Chapter 75 dealing with "Adverse Actions," section 7511(a)(1)(A) classifying which individuals fall into the category of statutory "employee."

Section 7511(a)(1)(A) defines an "employee" as "an individual in the competitive service who is not serving a probationary or trial period under an initial appointment or who has completed 1 year of *current* continuous employment under other than a temporary appointment limited to 1 year or less." 5 U.S.C. § 7511(a)(1)(A) (emphasis supplied).

Without doubt, Naphtali held a temporary appointment with the EPA. The evidence at trial clearly established that *Naphtali was fully aware of the temporary nature of his appointment.* And since Naphtali's appointment was only temporary, Naphtali may not be classified as an "employee" entitled to the procedural protections under section 7513 prior to termination of his temporary appointment.

Nor does the fact that Naphtali previously had a permanent appointment with the Energy department change the status of his classification by the EPA as a temporary employee. It bears repetition—in order to be entitled to procedural protections prior to termination, an employee must have "completed 1 year of *current* continuous service under other than a temporary appointment ..." 5 U.S.C. § 7511(a)(1)(A). Plainly, Naphtali did not possess a *current* non-temporary appointment, and thus he was not entitled to the procedural protection set forth in section 7513 prior to discharge. *Horner v. Lucas,* 832 F.2d 596

(Fed.Cir.1987) (in order to be an "employee" with procedural protection, one must "be serving in continuous employment in a non-temporary appointment *at the time of the adverse action.* Previous service in a non-temporary post, which is followed by new temporary positions, is irrelevant under the statute." *Id.* at 597 (emphasis in original)).

Hence, in view of the overwhelming evidence weighing in defendants' favor, the court holds that the EPA committed no procedural error in terminating Naphtali's temporary appointment.

### CONCLUSION

In compliance with the foregoing Findings of Fact and Conclusions of Law pursuant to Rule 52(a) Fed.R.Civ.P. the court adheres to its trial ruling dismissing the complaint in favor of the EPA.

Naphtali brought this action in good faith to redress a perceived wrong. Nevertheless, the evidence conclusively supports the court's holding in favor of the EPA. Despite Naphtali's *prima facie* showing, drawing upon highly persuasive testimony and convincing physical evidence the EPA established that the adverse employment actions taken against Naphtali were not discriminatory.

Rather, Naphtali's superiors truthfully articulated legitimate, nondisriminatory reasons for their actions stressing Naphtali's work-related deficiencies and the superior qualifications of other individuals, and their decisions were obviously not predicated upon Naphtali's age. Moreover, Naphtali's attempts to portray as pretextual the legitimate reasons proffered by the EPA for its actions are without merit.

Accordingly, the clerk is directed to dismiss plaintiff's complaint with prejudice, but without costs.